UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

RICHARD HENYARD,

        Petitioner,

-vs-                            Case No.    5:04-cv-621-Oc-10GRJ

JAMES V. CROSBY, JR.,Secretary,
Florida Department of Corrections, and
CHARLIE CRIST, Attorney General,
State of Florida,

        Respondents.

_____/

## **OPINION**

This is a capital habeas proceeding brought pursuant to 28 USC § 2254 by a Florida inmate who has been sentenced to death.[1]

The issues have been fully briefed and the case is ready for decision.  No evidentiary hearing is necessary because the record is fully developed and the claims of the Petition raise issues of law, not issues of fact.  All of the claims lack merit and the Petition will be denied.

## **Facts and Procedural History**

On Saturday, January 30, 1993, the Petitioner, then 18 years of age, aided and abetted by Alfonza Smalls, then 14 years of age, carjacked Dorothy Lewis and her

_____

[1]  The offenses of conviction and the trial in state court occurred in Lake County, Florida, within this district and this division.  The State concedes that the Petition was timely filed and that all of the claims were exhausted or were determined to be procedurally barred.

daughters, three year old Jasmine and seven year old Jamilya.   The carjacking occurred late at night in the parking lot of a Winn-Dixie grocery store in Eustis, Florida.

After driving to a remote location, both of the perpetrators raped Ms. Lewis on the trunk of her automobile after which she was shot three times and left for dead.[2] Her daughters were then driven to another location where the Petitioner shot and killed both of them.[3]

Henyard and Smalls were quickly apprehended and indicted.  The indictment, returned on February 16, 1993, consisted of eight counts charging the Defendants with kidnapping while armed, sexual battery while armed, attempted first degree murder (of Ms. Lewis), robbery while armed (against Ms. Lewis), and two counts of first degree murder (of Jasmine and Jamilya).[4]

The case was tried on May 23 through June 3, 1994.  The Petitioner, who did not testify, was convicted of all counts in which he was named including the two first degree murder counts involving the killing of the two minor children.  After the penalty phase the jury recommended the death sentence for the Petitioner by a vote of 12 to 0.  The trial judge then imposed a sentence of death, finding four aggravating factors: (1) that the Petitioner had been convicted of a prior violent felony; (2) that the murders had been committed in the course of committing another, violent felony; (3) that the

---

[2] Ms. Lewis miraculously survived and testified at the Petitioner's trial.

[3] A more detailed statement of the facts may be found in Henyard v. State, 689 So.2d 239 (Fla. 1997).

[4] The defendants were severed for trial and Henyard was tried first.

offense was committed for pecuniary gain; and (4) the murders were especially heinous, atrocious or cruel.

The conviction and sentence were affirmed on direct appeal. Henyard v. State, 689 So.2d 239 (Fla. 1996). A writ of certiorari was denied by the Supreme Court of the United States. Henyard v. Florida, 522 U.S. 846, 118 S.Ct 130 (1997). A timely motion for postconviction relief was filed in the state trial court under Florida Rule of Criminal Procedure 3.850. The trial court held an evidentiary hearing and ultimately denied the motion. An appeal, in conjunction with an original petition for habeas corpus, was then filed in the Supreme Court of Florida which denied all relief on May 27, 2004. Henyard v. State, 883 So.2d 753 (Fla. 2004). No petition for certiorari was filed in the Supreme Court of the United States.

Petitioner's timely motion under 28 USC § 2254 was then filed in this court on December 20, 2004. All of the claims presented in the motion have been exhausted in the state courts.

## Standard of Review

Under 28 USC § 2254(d) and (e) as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this court's review of the state court's factual findings must be highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing evidence. Similarly, the state courts' resolutions of issues of law - - including constitutional issues - - must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involved an "unreasonable application" of such precedent. Williams

v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000).  Indeed, it is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." Id. Breedlove v. Moore, 279 F.3d 952 (11th Cir. 2002).

### The Claims of the Petition

The Petitioner's petition presents ten claims of constitutional deprivation.  Each claim will be considered in turn.

### CLAIM ONE

> THE TRIAL COURT'S DENIAL OF A CHANGE OF VENUE VIOLATED THE PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

Petitioner argues in his first claim that his constitutional rights were violated when the state trial court denied his motion for a change of venue.  On February 3, 1994, Petitioner filed a motion for change of venue based on pretrial publicity.  (Ex. A1 at 162-76).  After hearing argument from counsel, the trial court denied the motion. (Ex. A22 at 2581-99).  Petitioner renewed his motion during voir dire at trial, and the trial court again denied it.  (Ex. A14 at 1009).

Petitioner raised the issue on direct appeal to the Florida Supreme Court.  (Ex. A33 at 27-31).  In denying this claim, the Florida Supreme Court stated:

> In McCaskill v. State, 344 So.2d 1276, 1278 (Fla. 1977), we adopted the test set forth in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), and Kelley v. State, 212 So.2d 27 (Fla. 2d DCA 1968), for determining whether to grant a change of venue:

4

> Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue.  The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom.

Id. 344 So.2d at 1278 (quoting Kelley, 212 So.2d at 28).  See also Pietri v. State, 644 So.2d 1347 (Fla. 1994), cert. denied, 515 S.Ct. 2588, 132 L.Ed.2d 836 (1995).   In Manning v. State, 378 So.2d 274 (Fla. 1980), we further explained:

> An application for change of venue is addressed to the sound discretion of the trial court, but the defendant has the burden of . . . showing that the setting of the trial is inherently prejudicial because of the general atmosphere and state of mind of the inhabitants in the community.  A trial judge is bound to grant a motion for a change of venue when the evidence presented reflects that the community is so pervasively exposed to the circumstances of the incident that prejudice, bias, and preconceived opinions are the natural result.  The trial court may make that determination upon the basis of evidence presented prior to the commencement of the jury selection process, or may withhold making the determination until an attempt is made to obtain impartial jurors to try the cause.

Id. at 276 (citation omitted).  Ordinarily, absent an extreme or unusual situation, the need to change venue should not be determined until an attempt is made to select a jury.

During the actual voir dire here, each prospective juror was questioned thoroughly and individually about his or her exposure to the pretrial publicity surrounding the case.

> While the jurors had all read or heard something about the case, each stated that he or she had not formed an opinion and would consider only the evidence presented during the trial in making a decision.  Further, the record demonstrates that the members of Henyard's venire did not possess such prejudice or extensive knowledge of the case as to require a change of venue.  Therefore, we find that on the record before us, the trial court did not abuse its discretion in denying Henyard's motions for a change of venue.

Henyard, 689 So.2d at 245-46.

The standard governing change of venue issues is derived from the Fourteenth Amendment's due process clause which safeguards a defendant's Sixth Amendment right to be tried by "a panel of impartial, 'indifferent' jurors." Coleman v. Kemp, 778 F.2d 1487, 1489 (11th Cir. 1985) (quoting Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639 (1961)), cert. denied, 476 U.S. 1164 (1986).  The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere.  In such a case, due process requires the trial court to grant a defendant's motion for a change of venue, Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417 (1963), or a continuance, Sheppard v. Maxwell, 384 U.S. 333, 362-63, 86 S.Ct. 1507 (1966).  At issue is the fundamental fairness of the defendant's trial, Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031 (1975).  There are two standards that guide analysis of this question, the "actual prejudice" standard and the "presumed prejudice" standard.

Actual prejudice occurs when the "prejudice actually enters the jury box and affects the jurors."  Presumably, Petitioner does not rely upon a showing of actual prejudice because his argument centers around the trial court's order denying his

6

request for a change of venue prior to trial and renewed during jury selection.  And, in any event, Petitioner has not identified any instances of "actual prejudice."  Rather, his argument involves alleged prejudice that is "presumed" from pretrial publicity.

In order to establish "presumed prejudice," a defendant must show "first that pretrial publicity was sufficiently prejudicial and inflammatory and second that the prejudicial pretrial publicity saturated the community where the trial was being held." Spivey v. Head, 207 F.3d 1263, 1270 (11th Cir. 2000).  Presumed prejudice is rarely applicable, and is reserved for an extreme situation.  Coleman, 778 F.2d at 1490.  In fact, the Eleventh Circuit has noted that only a very few cases have granted relief under this standard.  Id.

The Petitioner argued in state court, and reargues here, that the state trial court erred in denying his request for a change of venue due to the prejudicial nature of the pretrial publicity which allegedly saturated the community.[5]  The voir dire proceedings in this case consumed almost 1,000 pages of transcript and included an extensive individual voir dire about the pretrial publicity.  (Exs. A9-A14 at 16-1004).  The jurors who were selected to serve all agreed that any pretrial publicity would not bias them or interfere with their ability to follow the trial court's instructions.  None of the seated jurors had more than slight knowledge of the case, and there is nothing in the trial record to suggest that the case was decided based on anything other than the evidence introduced by the State, which was, to say the least, overwhelming.

---

[5]  The Petitioner's characterization of Lake County as "rural"  (Petition, page 9) is somewhat misleading.  The county was, at the time of Petitioner's trial, a rapidly growing amalgamation of several communities north of the Orlando metropolitan area.

The state trial court found no legal reason to grant the Petitioner's motion for a change of venue and the Florida Supreme Court was not "objectively unreasonable" when it found that the trial court acted within its discretion in denying the motion. After reviewing the direct appeal record, the Florida Supreme Court made factual findings that each prospective juror was questioned extensively about the pretrial publicity and, although each of the selected jurors had read or heard something about the case, "each stated that he or she had not formed an opinion and would consider only the evidence presented during the trial in making a decision." Henyard, 689 So.2d at 246. Petitioner has failed to proffer any evidence to rebut this factual finding.

Furthermore, in denying Petitioner's claim on direct appeal, the Florida Supreme Court correctly utilized the applicable law as established by the United States Supreme Court in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031 (1975).[6] In Murphy, the Court noted that the constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors, but qualified jurors need not be totally ignorant of the facts and issues involved. 421 U.S. at 799-800, 95 S.Ct. at 2036.

The state court's legal ruling on Petitioner's claim was not "contrary to" clearly established federal law as determined by the United States Supreme Court, nor did

---

[6] Petitioner's assertion that "[t]he Florida courts' disposition of this issue was contrary to and an unreasonable application of federal constitutional law as determined by the United States Supreme Court in Rideau, Sheppard v. Maxwell, and other authority cited herein," is without merit. Petition for Writ of Habeas Corpus at 9. These cases pre-date the Court's decision in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031 (1975), cited by the Florida Supreme Court in Henyard. Petitioner has failed to carry his burden of demonstrating that the state courts' disposition was contrary to and an unreasonable application of federal constitutional law.

it involve an "unreasonable application" of such law.  28 USC § 2254(d)(1).  Petitioner

has failed to establish any grounds for federal habeas relief on this issue.  Claim One

is without merit and is DENIED.

## CLAIM TWO

> PETITIONER WAS DENIED RIGHTS
> SECURED BY THE FOURTH AND
> FOURTEENTH AMENDMENTS DUE TO THE
> FAILURE OF THE TRIAL COURT TO
> SUPPRESS HIS STATEMENTS.

On Sunday, January 31, 1993, the day after the murders, the Petitioner

voluntarily went to the Eustis Police Department to provide information about the

crimes.  While there he made a statement that his trial counsel later moved to

suppress.  The motion was overruled and the statement was admitted at Petitioner's

trial.  The admission of the statement was one of the Petitioner's principal claims of

error on  his direct appeal.[7]  Henyard, 689 So.2d at 246-248.

During his interview session with the investigating officers, Petitioner asked on

one occasion:  "Can I go home soon, man?"  and "How long am I gonna have to stay

here?"  On another occasion he stated:  "Take me to my aunt's house."  The

Petitioner argues that these questions and statements were sufficient to convey a

desire to terminate the interrogation and that, by continuing the interview, the

investigating officers violated the rule of Miranda.

---

[7]  The Petitioner actually made several incriminating statements at different times, but only the first was offered and admitted in evidence at trial.

The Supreme Court of Florida thoroughly reviewed the issue and, citing <u>Moore v. Dugger</u>, 856 F.2d 129 (11th Cir. 1988), and <u>Delap v. Dugger</u>, 890 F.2d 285 (11th Cir. 1989), <u>cert</u>. <u>denied</u>, 496 U.S. 929, 110 S.Ct. 2628 (1990), held that there was no violation of <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602 (1966).

Both <u>Moore</u> and <u>Delap</u>, Eleventh Circuit decisions, dealt with similar factual situations involving suspects who asked how much longer the interrogation would last or when the subject might go home.  The Court of Appeals concluded in both instances that there was no violation of <u>Miranda</u>.  Those decisions clearly support the result reached by the Florida Supreme Court in this case, and the Petitioner cites no precedent of the Supreme Court of the United States suggesting that suppression was required.  Moreover, the Florida Supreme Court also decided as an alternative basis of its holding, that admission of the statement, if erroneous, was nevertheless harmless beyond a reasonable doubt. <u>Arizona v. Fulminante</u>, 499 U.S. 279, 111 S.Ct. 1246 (1991).

Even if one could conclude on this record that the Supreme Court of Florida was wrong in its interpretation and application of the law, no one could persuasively argue that the Court's decision on this point was "objectively unreasonable."  Claim Two is without merit and is Denied.

### CLAIM THREE

> PETITIONER WAS DENIED DUE PROCESS BECAUSE OF THE CUMULATIVE EFFECT OF ERRONEOUS TRIAL RULINGS, PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL.

A.    <u>Improper Prosecutorial Comments in voir dire</u>.

During jury selection the prosecutor made the statement that "if the evidence of the aggravators outweighs the mitigators by law your recommendation must be for death."

On direct appeal, after citing <u>Gregg v. Georgia</u>, 428 U.S. 153, 203, 96 S.Ct. 2909, 2939 (1976) for the proposition that a jury is free to dispense mercy and is not required to recommend death even if the aggravating factors outweigh the mitigating evidence, the Florida Supreme Court said:

> In this case, we agree with Henyard that the prosecutor's comments that jurors must recommend death when aggravating circumstances outweigh mitigating circumstances were misstatements of law. But, contrary to Henyard's assertions, we do not find that he was prejudiced by this error. Initially, we note the comments occurred on only three occasions during an extensive jury selection process. Moreover, the misstatement was not repeated by the trial court when instructing the jury prior to their penalty phase deliberations. In fact, the jury was advised that the statements of the prosecutor and defense lawyer were not to be treated as the law or the evidence upon which a decision was to be based. Further, Henyard does not contend that the jury was improperly instructed before making an advisory sentence recommendation in the penalty phase of his trial. In this context, we find the prosecutor's isolated misstatements during jury selection to be harmless error. <u>State v. DiGuilio</u>, 491 So.2d 1129 (Fla. 1986).

<u>Henyard</u>, 689 So.2d at 250.

The Petitioner does not dispute the soundness of the Florida court's decision on this claim and, in particular, does not attempt to demonstrate how the court's decision was "contrary to" or constituted an "unreasonable application" of Supreme

Court precedent.  Rather, he argues, that the harmless error became harmful when considered in conjunction with other trial court "errors" that do not, standing alone, warrant any relief.

B.    Failure of the Trial Court to Grant Certain Challenges for Cause.

The Petitioner complains that the trial court should have excused three of the potential jurors for cause.  However, Petitioner's counsel used peremptory challenges to excuse those potential jurors and, on request, was granted an additional peremptory challenge which was used to strike another juror.  No specific request was made for additional peremptory challenges, and this omission effected a procedural bar of the present claim under Florida law.  See Hill v. State, 477 So.2d 553, 556 (Fla. 1985), and Trotter v. State, 576 So.2d 691, 693 (Fla. 1990).

On Petitioner's direct appeal the Supreme Court of Florida expressly held that this claim of error had not been preserved and was procedurally barred.  For that reason the claim is also procedurally barred in this Court and the Petitioner does not contend otherwise.  Rather, he argues again that, taken together with other defaulted claims or harmless errors, he should be entitled to relief.

C.    Erroneous Admission of DNA Evidence.

During Petitioner's trial the Court admitted over objection the testimony of a serologist employed by the Florida Department of Law Enforcement concerning the results of DNA testing performed on blood stains found on Petitioner's clothing.  On direct appeal the Supreme Court of Florida reviewed this issue at length - - treating the question exclusively as a state law evidentiary problem - - and held that the trial

12

court did not abuse its discretion in admitting the results of the DNA analysis. <u>Henyard</u>, 689 So.2d at 248-249.

The State responds to this claim by correctly pointing out that federal courts do not sit to review state evidentiary rulings.  <u>Osborne v. Wainwright</u>, 720 F.2d 1237, 1238 (11th Cir. 1983).  Such an issue reaches a constitutional level only when the admission of the disputed evidence was error <u>and</u> rendered the trial fundamentally unfair.  Here there was no error at all, much less one rendering the Petitioner's trial fundamentally unfair.  <u>Id.</u>

 D. <u>Prosecutorial Comments in Closing Arguments.</u>

This issue was presented on the Petitioner's direct appeal and was decided adversely to Petitioner's position by the Supreme Court of Florida:

> Next, Henyard contends that the prosecutor made a false statement during his closing argument.  The complained-of argument is as follows:
>
>> And then they [defense counsel] will tell you he was cooperative when he went to the police. He eventually told them what happened and he told them that he didn't kill the girls.  And my first thought in that regard is, does it matter how many times you tell a lie for it to become the truth?  Because I say it nineteen times or nineteen thousand times, does it make it so? And we all know it doesn't.  You have to look at everything that is going on and see in that same story he is telling them, I never raped anybody.
>
> Henyard contends that the prosecutor's argument was improper because the prosecutor characterized the defendant as a liar by intimating that Henyard never admitted to the rape when, in fact, he did admit that he raped Ms. Lewis in this final statement made to police.  We

disagree.  As previously noted, see supra note 7, Henyard made three confessions at the Eustis Police Department on the day following the murder of the Lewis girls, but only his first statement was admitted against him at trial.  In this first statement Henyard confessed that he abducted Ms. Lewis and her children and drove them to a deserted area where he shot Ms. Lewis in the leg and head, but denied that he raped Ms. Lewis or killed her daughters.  In his last statement, Henyard finally confessed that he did rape Ms. Lewis, but continued to deny that he killed her daughters.

When the prosecutor's closing argument is read in its entirety and fairly considered, it is clear that the prosecutor was referring to Henyard's lack of candor and failure to be completely forthcoming about his involvement in the offense when he initially confessed, and was not making a bad faith argument which implied that Henyard never confessed to the sexual battery of Ms. Lewis.  In essence, the prosecutor argued to the jury that because the state had offered evidence at trial which clearly contradicted and discredited Henyard's initial assertion that he did not rape Ms. Lewis, the jury should not believe Henyard's further assertions that he also did not kill Jasmine and Jamilya Lewis.  We find that the prosecutor's argument was a legitimate comment on the truthfulness, or lack thereof, of Henyard's claim of innocence, and contrary to Henyard's assertion, was not improper.

Henyard, 689 So.2d at 250-251 (Fla. 1996).

The disposition of this claim by the Supreme Court of Florida was imminently reasonable and correct.  Petitioner's argument to the contrary is meritless.

In summary, then, two of the four "errors" asserted by the Petitioner in this claim were not errors at all.  Another, (the challenges for cause) may or may not have constituted error but was procedurally defaulted; and the fourth (the prosecutor's statement during voir dire) was clearly harmless as the Florida Supreme Court determined.  The Petitioner tacitly concedes that, standing alone, none of these

14

assertions warrants any relief; and, even when taken together, there is no semblance of an argument that the state courts' rulings were contrary to or constituted an unreasonable application of any clearly established Supreme Court precedent.  Claim Three is without merit and is Denied.

### CLAIM FOUR

THE AGGRAVATING CIRCUMSTANCE OF PREVIOUS CONVICTION OF A VIOLENT FELONY VIOLATED THE EIGHTH AMENDMENT UNDER JOHNSON V. MISSISSIPPI.

In this claim the Petitioner contends that a constitutional error occurred under Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981 (1988), when the trial court admitted into evidence, during the penalty phase of his trial, Petitioner's prior juvenile adjudication for armed robbery.  The evidence was admitted in support of one of the statutory aggravators under Florida law - - a prior conviction of a felony involving the use or threat of violence to the person.

Prior to Petitioner's appeal, the Supreme Court of Florida had held in Merck v. State, 664 So.2d 939 (Fla. 1995), that a juvenile adjudication could not be treated as a criminal "conviction" under Florida statutory law, and could not, therefore, be received in evidence as an aggravator in a capital case.  The Florida high court applied its decision in Merck to Petitioner's case and concluded that it was error to admit Petitioner's juvenile adjudication during the penalty phase of his trial.  The Court also found, however, that the error was harmless due to the presence of six other

contemporaneous violent felony convictions supporting the aggravating circumstance involved.

In <u>Johnson</u>, <u>supra</u>, the prior conviction relied upon as an aggravator had been reversed on appeal.   The United States Supreme Court held, under those circumstances, that the petitioner was entitled to postconviction relief especially where the state court had expressly declined to engage in a harmless error analysis.

The state in this case argues that <u>Johnson</u> is clearly distinguishable on two grounds.   First, the prior state court conviction in <u>Johnson</u> had been vacated and ceased to exist.   Here, by contrast in Petitioner's case, the juvenile adjudication remains valid and represents a conclusive judicial finding that the Petitioner had engaged in the underlying criminal behavior - - an armed robbery.   The fact that the juvenile adjudication does not constitute a "conviction" under Florida law is just that, a matter of state law having no federal constitutional implications.   Juvenile adjudications are used every day in the federal courts as sentencing enhancers even though the state in which the adjudication occurred does not treat juvenile judgments as "convictions" under state law.   <u>See</u>, <u>e.g.</u>, <u>United States v. Acosta</u>, 287 F.3d 1034 (11th Cir. 2002); <u>United States v. Owens</u>, 15 F.3d 995 (11th Cir. 1994); <u>United States v. Burge</u>, 407 F.3d 1183 (11th Cir. 2005).

Secondly, the Supreme Court of Florida determined, unlike the Mississippi court in <u>Johnson</u>, that jury exposure to the Petitioner's prior juvenile adjudication was harmless error.

> Nevertheless, we reject Henyard's claim that the trial court's improper   consideration   of   Henyard's   prior   juvenile

> adjudication as a violent felony entitles him to a new sentencing hearing.  Unlike the violent felony adjudications at issue in <u>Merck</u>, the testimony concerning Henyard's juvenile adjudication was modest and served to minimize his role in the prior offense.  Moreover, the record reflects without dispute the presence of six other contemporaneous felony convictions of Henyard to support the prior violent felony aggravator for each death sentence even absent Henyard's juvenile adjudication for robbery with a weapon. Accordingly, we find the trial court's improper admission into evidence and consideration of Henyard's juvenile adjudication for robbery with a weapon to be harmless beyond a reasonable doubt.  <u>State v. DiGuilio</u>, 491 So.2d at 1129.

<u>Henyard</u>, 689 So.2d at 252.

<u>Johnson</u> is easily distinguishable, and the Petitioner has not otherwise shown that the decision of the  Supreme Court of Florida was contrary to, or constituted an unreasonable application of, governing Supreme Court precedent.  Claim Four is without merit and is Denied.

## **CLAIM FIVE**

> CONSIDERATION OF THE AGGRAVATING CIRCUMSTANCE THAT THE MURDERS WERE COMMITTED FOR THE PURPOSE OF AVOIDING ARREST VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS.

The trial court, in instructing the jury concerning the statutory aggravating circumstances it might consider, included the factor that the murders had been committed for the purpose of avoiding arrest.  There was no objection to this instruction.  The court itself, in its subsequent sentencing order did not mention or rely upon that factor as an aggravating circumstance.

17

On direct appeal to the Supreme Court of Florida that court imposed a procedural bar and refused to consider the issue (denominated as Petitioner's point 8(a) on appeal) because it had not been preserved by appropriate objection in the trial court.  Henyard, 689 So.2d at 244-245.  The Court also noted, in any event, that if there was error on this point, it was harmless.  Id.

The Petitioner has not demonstrated how the disposition of the matter by the Supreme Court of Florida was contrary to, or constituted an unreasonable application of, governing Supreme Court precedent.  Claim Five is without merit and is Denied.

## CLAIM SIX

> EVIDENTIARY   ERROR   REGARDING
> ADMISSION OF BLOOD STAIN PATTERN
> ANALYSIS VIOLATED PETITIONER'S RIGHT
> TO DUE PROCESS.

Despite the wording of this claim, the Petitioner does not argue that the admission of blood stain pattern evidence was error under the rules of evidence; rather, he argues that the state's expert who so testified was simply wrong - - that another expert is now available who would offer contrary opinions.

The Supreme Court of Florida ruled that the testimony of the state's blood spatter analyst was properly admitted by the trial judge (Henyard, 689 So.2d at 253), and the Petitioner is unable to demonstrate that this ruling was contrary to or constituted an unreasonable application of governing precedent from the Supreme Court of the United States.  Claim Six is without merit and is Denied.

## CLAIM SEVEN

THE JURY INSTRUCTION ON THE
HEINOUS, ATROCIOUS AND CRUEL
AGGRAVATOR IS UNCONSTITUTIONALLY
VAGUE AND OVERBROAD IN VIOLATION
OF THE EIGHTH AND FOURTEENTH
AMENDMENTS.

In Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926 (1992), following its

earlier decisions in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759 (1980),

Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853 (1988), and Shell v. Mississippi,

498 U.S. 1, 111 S.Ct. 313 (1990), the Supreme Court held that the Florida jury

instruction as given in Espinosa's case concerning the heinous, atrocious or cruel

(HAC) aggravator was unconstitutionally vague.  However, the Espinosa instruction

did not elaborate upon the terms of the statute; the key words were not defined or

limited in scope.  See Hall v. State, 614 So.2d 473, 478 n.5 (Fla. 1993).

As early as 1973, the Supreme Court of Florida was called upon in State v.

Dixon, 283 So.2d 1 (Fla. 1973), to respond to numerous questions certified to the

court by the state's trial courts concerning the construction and constitutionality of

Florida's death penalty act that had been adopted in the wake of Furman v. Georgia,

408 U.S. 238, 92 S.Ct. 2726 (1972).  Among the issues decided in Dixon was the

meaning to be given to the "heinous, atrocious or cruel" aggravator.  The court

supplied a definition of those terms and limited the scope of the HAC aggravator to

"those capital crimes where the actual commission of the capital felony was

accompanied by such additional acts as to set the crime apart from the norm of

capital felonies - - the conscienceless or pitiless crime which is unnecessarily tortuous

19

to the victim." Dixon, supra, 283 So.2d at 9.  As so construed and limited, the Florida

HAC aggravator was specifically upheld against constitutional attack in Proffitt v.

Florida, 428 U.S. 242, 255-256, 96 S.Ct. 2960, 2968 (1976).  Also, the addition of the

last sentence of the instruction in Dixon served to cure the flaw found to be

unconstitutional in Godfrey, Maynard and Shell.

Notwithstanding the decisions in Dixon and Proffitt, the state's standard jury

instructions were not amended to incorporate the Dixon limitation on the HAC

aggravator until 1990.  See In re Standard Jury Instructions Criminal Cases No. 90-1,

579 So.2d 75 (Fla. 1990).  As a result, in some capital cases tried in Florida before

1990, like Espinosa, the jury instruction concerning the HAC aggravator consisted of

nothing more than a reading of the statute itself.  See Hall v. State, supra.  By

contrast, in this case (tried in 1994), the trial judge gave the full Dixon-Proffitt jury

instruction.

> The crime for which the defendant is to be sentenced was
> especially heinous, atrocious or cruel.  Heinous means
> extremely wicked or shockingly evil.  Atrocious means
> outrageously wicked and vile.  Cruel means designed to
> inflict a high degree of pain with utter indifference to, or
> even enjoyment of, the suffering of others.  The kind of
> crime intended to be included as heinous, atrocious or cruel
> is one accompanied by additional acts that show the crime
> was conscienceless, pitiless or was unnecessarily tortuous
> to the victim.

The Petitioner has thus failed to demonstrate that the Florida Supreme Court

disposed of this claim in a manner that was "contrary to" or involved an "unreasonable

application" of Supreme Court precedent.  Claim Seven is without merit and is

Denied.

## **CLAIM EIGHT**

TRIAL COUNSEL FAILED TO ADEQUATELY
INVESTIGATE AND PRESENT MITIGATING
EVIDENCE AND FAILED TO ADEQUATELY
CHALLENGE THE STATE'S PENALTY
PHASE CASE IN VIOLATION OF THE SIXTH,
E I G H T H   A N D   F O U R T E E N T H
AMENDMENTS.

Under this claim the Petitioner presents a number of ineffective assistance of

counsel contentions involving the penalty stage of his trial.  These contentions were

raised in Petitioner's post conviction motion for collateral relief.  The trial court

conducted an evidentiary hearing and entered an order stating findings and

conclusions denying the claim in its entirety.  On appeal, the Supreme Court of Florida

issued an opinion stating its findings and conclusions, and affirmed the denial of any

relief.  Henyard, 883 So.2d 753 (Fla. 2004).

(a).   Background

An examination of the petition discloses that the Petitioner has seven specific

complaints about the performance of his trial counsel during the penalty phase of his

trial: (1) his counsel failed to investigate and present evidence of Petitioner's deprived

childhood; (2) his counsel should have presented testimony about Edith Ewing's

corporal punishment or spanking of the Petitioner when he was 14 or 15 years old;

(3) his counsel should have presented testimony about the Petitioner's desire not to

be promoted in school, and his preference to remain with younger children; (4) his

counsel should have presented testimony about Petitioner's childhood sexual abuse;

(5) his counsel should have presented testimony about the Petitioner's abuse of alcohol; (6) his counsel should have presented testimony about the Petitioner's suicidal ideation; and (7) his counsel was deficient in preparing one of his witnesses, Dr. Jethro Toomer, a psychologist.

Before discussing each of these contentions about what Petitioner's trial counsel did <u>not</u> do at the penalty phase, it is appropriate to briefly review what counsel <u>did</u> present at that stage of the trial.

The defense called eight (8) witnesses during the penalty phase of Petitioner's trial. The first witness, Jeffery Pfister, was the Petitioner's lawyer during the proceeding that resulted in the Petitioner's juvenile adjudication for committing the offense of robbery with a weapon. The state had offered, and the court had received in evidence during the state's case addressing penalty, a copy of the judgment in the Petitioner's juvenile proceeding. (<u>See</u> Claim Four, <u>supra</u>). Mr. Pfister testified that the Petitioner performed the role of exterior lookout during the offense, and that the "weapon" used by the robber (Petitioner's accomplice) was nothing more than a broomstick. Such testimony, obviously, was properly offered to dilute the facial gravity of a conviction for robbery with a weapon.

The second witness called by Petitioner's counsel was also a lawyer qualified as an expert concerning the application of Florida's sentencing guidelines in criminal cases. He testified that the Petitioner, given the convictions already handed down by the jury, would spend his life in prison without parole. He also testified that Petitioner's accomplice, Alfonza Smalls, could not be given the death penalty because

of his age (14 years old).  This testimony served a dual purpose.  First, it diffused any practical concern the jury might have about the Petitioner's future danger to society as a whole if his life was spared; and, second, it introduced a consideration of parity in sentencing as a justification for a sentence of life rather than death.

The remaining six witnesses called by the defense consisted of Nyoka Wiley, Jacqueline Turner's daughter who was raised with the Petitioner; Edna McClendon, one of Petitioner's teachers; Richard Henyard, Sr., Petitioner's father; Jacqueline Turner, who actually cared for and raised the Petitioner during much of his life until age eleven; Hattie Mae Gamble, Petitioner's mother; and Dr. Jethro Toomer, a psychologist.

Nyoka Wiley, a daughter of Jacqueline Turner, testified that she was raised with the Petitioner during the extended periods of time that he lived in Turner's home, and that his mother, Hattie Gamble, was never present and took no maternal interest in the Petitioner.  Wiley also testified that the Petitioner wanted to go back to middle school "to be with people younger than him."  (R. 2244).

Edna McClendon, one of the Petitioner's teachers in Pahokee, testified that neither of his parents ever came to the school - - even to enroll him - - but he was never a disciplinary problem.  She also testified that the Petitioner would sometimes hyperventilate, apparently due to asthma.

Richard Henyard, Sr., Petitioner's father, testified that he was never married to Petitioner's mother, Hattie Gamble; that she had custody of the Petitioner in Lake County while he, the father, worked as a truck driver in Pahokee; that he saw the

Petitioner only briefly on rare occasions - - and not at all between the time the Petitioner was 7 or 8 until he became 11 years of age; that he then discovered that the Petitioner was living "out of doors" (R. 2260), meaning a homeless existence; and that he then took the Petitioner to Pahokee where he remained, with one or two interruptions, until he was approximately 15 ½ years old.  Even so, Henyard, Sr., had very little contact with the Petitioner and did not fill the role of a true father figure during those years because he, the father, worked up to 90 hours a week.  (R. 2264-2265).

Jacqueline Turner testified that she was acquainted with Hattie Gamble, the Petitioner's mother; that Hattie drank heavily and smoked marijuana during her pregnancy with the Petitioner; that she, Turner, simply took the Petitioner into her care as an infant because his mother, Hattie, was unable and unfit to care for him; and that she kept the Petitioner from infancy until he was 3 years of age at which time he returned to his mother.  While the Petitioner lived with his mother, Hattie, he was ridiculed by other children concerning his mother's lifestyle and her addiction to cocaine, and by age 11, the Petitioner was essentially on his own living on the streets. At that time, Turner, unable to control the Petitioner, called his father to come and get him.

Hattie Mae Gamble, the Petitioner's mother, testified that she drank to excess and used marijuana and cocaine during the time the Petitioner lived with her; that she made no inquiry about him after he left for his father's home in Pahokee at age 11;

and that, in fact, she was in jail herself at the time the Petitioner committed the murders in question.

Dr. Jethro Toomer, a clinical psychologist, testified that he had examined and had administered several tests to the Petitioner on two occasions.  He stated that the Petitioner has an IQ of 85, "below the average range of intellectual functioning;" that Petitioner has a thought disturbance that inclines him toward impulsive acts and drug dependency; that he is impaired both emotionally and psychologically, and functions at the level of a 13 year old child (R. 2340); that the Petitioner shows signs of both paranoia and schizophrenia, but is not psychotic; and that his impairment reduces his appreciation of the criminality of his conduct and his ability to conform his behavior to the requirements of the law. (R. 2349).

(b).   Discussion of the issues

1.   Not investigating and presenting evidence of Petitioner's deprived childhood.  This aspect of the claim borders on being frivolous.  The unrebutted testimony adduced by the Petitioner's counsel during the penalty phase at trial clearly painted a vivid picture of the Petitioner's deprived and horrendous childhood.  Any additional witnesses who might have testified to the same effect would have been cumulative.  Regardless of the alleged deficiency of counsel, therefore, the Petitioner cannot satisfy the prejudice prong of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984) concerning this aspect of his claim, and that is precisely the basis on which the Supreme Court of Florida resolved the issue.

> [E]ven if we were to assume that Henyard's attorneys performed deficiently by failing to track down these four

> witnesses and present their testimony at the penalty phase,
> pursuant to the second prong of the <u>Strickland</u> test,
> Henyard did not suffer any prejudice because the testimony
> of the four witnesses was substantially similar to and
> cumulative with testimony that was actually presented
> during the penalty phase.

<u>Henyard</u>, 883 So.2d at 759.

The Petitioner has failed to demonstrate that the state court disposition of this part of his claim was "contrary to" or constituted an "unreasonable application of" governing Supreme Court precedent.

2.    <u>Not revealing Ewing's spanking of the Petitioner</u>.  Petitioner claims that his counsel was prejudicially ineffective for not offering evidence that he suffered corporal punishment as a teenager when Edith Ewing, his father's common law wife, spanked him on the legs with a belt.  After the evidentiary hearing conducted on the Petitioner's postconviction motion under Florida Rule of Criminal Procedure 3.850, the state trial court found:

> At the age of fourteen or fifteen, the defendant stole items
> from [Ewing's] home, including a VCR and a pistol.  As
> punishment, Ms. Ewing on occasion spanked the defendant
> with a belt on the legs.  These spankings were neither
> frequent nor excessive, and never resulted in injury to or
> complaint from the defendant. (H-171;H-176 to 178).

> Mr. Henyard's trial attorneys did not present evidence of the
> spankings to the jury.  But probably made a strategic
> decision to keep from the jury any evidence of the
> defendant's history of stealing other people's property. (R-
> 2440); (H-192).

The rejection of this claim by the trial court was discussed at length and affirmed by the Supreme Court of Florida.  <u>See</u> <u>Henyard</u>, 883 So.2d at 760-761.

26

There was no evidence of any significant or long term physical abuse, and Petitioner's trial counsel - - being well aware of the spankings - - deliberately and reasonably decided not to pursue that thread of mitigation because of its downside. Evidence of the spankings would have opened the door to the reasons for the discipline, namely, thefts by the Petitioner of Ms. Ewing's property (R. 2440).

There was no ineffective assistance of counsel on this point of dispute; and, if there was, Petitioner is wholly unable to demonstrate any prejudice.  Indeed, as counsel reasonably assessed the situation, evidence of the spankings would have been more harmful than beneficial.

3.      Not presenting evidence of Petitioner's desire to stay back in school with younger children and his harassment by younger children.  The Petitioner claims that evidence should have been submitted by his counsel during the penalty phase of his trial that he did not want to be promoted in school, preferring to remain with younger children.  He also contends that evidence should have been presented about his harassment by other children.  In making this claim the Petitioner simply overlooks the fact that such evidence was presented to his jury.  Nyoka Wiley testified about the Petitioner's desire to remain in a lower grade to associate with younger children (R. 2244), and Jacqueline Turner testified about the Petitioner's harassment by his peers. (R. 2286).  This claim is simply refuted by the record.

4.      Not presenting testimony about Petitioner's sexual abuse as a child.  Several witnesses testified at the state trial court's evidentiary hearing on the Petitioner's 3.850 motion that the Petitioner had told them that he had been sexually

molested as a child by a neighbor.  Yet no evidence of such abuse was presented by

Petitioner's counsel during the penalty phase of his trial.

The Supreme Court of Florida disposed of this claim as follows:

> Initially, we would note that the evidence of [Petitioner's sexual] abuse introduced at the evidentiary hearing came from witnesses who were repeating what Henyard had told them and there was no indication that these witnesses shared this information with Henyard's trial counsel. Moreover, defense counsel was aware of at least two instances where Henyard had specifically said that he was not sexually abused.  As noted above, according to Strickland, the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  466 U.S. at 691, 104 S.Ct. 2052.  Strickland further states, '[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'  Id.  When determining reasonableness, there is a 'heavy measure of deference to counsel's judgments.'  Id.  Although we recognize the difficulty individuals may have in reporting such abuse, in this situation where Henyard had specifically denied on at least two occasions that he had been sexually abused, it is not clear that trial counsel's failure to investigate the conflicting evidence that Henyard may have been molested amounts to ineffective assistance of counsel.
>
> Of course, Henyard was able to introduce evidence that at least one member of his defense team was aware that Henyard claimed he had been abused.  Nevertheless, even if we were to determine that trial counsel should have conducted further investigations into the allegations of molestation, the evidence that Henyard introduced at the evidentiary hearing does not demonstrate that he was prejudiced in this case.  The only information introduced at the hearing consisted of brief, second-hand accounts by witnesses of what Henyard had told them.  There was no additional evidence that the alleged molestation had in fact occurred.  Likewise, there was no testimony from mental health experts as to how the alleged molestation, which

> occurred a decade before the crime, had affected Henyard.
> Therefore, the trial court did not err in finding that Henyard
> has not demonstrated prejudice on this claim.

Henyard, 883 So.2d at 761-762.

The United States Supreme Court's most recent decision applying Strickland to claims of deficient investigation and presentation of evidence at the penalty phase of a capital murder trial is Rompilla v. Beard, ____ U.S. ____, 125 S.Ct. 2456 (2005). In that case the Court found that a failure to investigate the circumstances surrounding the defendant's prior conviction, which the prosecution intended to use as an aggravator, constituted prejudicial ineffective assistance of counsel.   However, those were not the circumstances in this case.  Petitioner's counsel did investigate the Petitioner's prior juvenile adjudication and called a witness to explain the Petitioner's relative lack of culpability in the commission of that offense.

The few other decisions in which the high court has found a violation of its Strickland standards for evaluating the effective assistance of counsel are also distinguishable.   In Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527 (2003), for example, defense counsel failed to investigate the defendant's background and did not present any mitigating evidence at all.  Similarly, in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000), there was no investigation and no presentation of any humanizing mitigation.  In Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574 (1986), counsel for the defendant was ineffective because he did not perform any investigation which would have prompted the filing of a motion to suppress.

In sum, the Petitioner has not demonstrated that the Supreme Court of Florida's decision in his case was either contrary to clearly established federal law or involved an unreasonable application of such law.  This aspect of his claim is therefore without merit.

      5.   <u>Not presenting evidence of the Petitioner's abuse of alcohol</u>.   The Supreme Court of Florida dealt with this sub issue as follows:

> Henyard alleges that trial counsel was ineffective for failing to investigate or present evidence to the jury regarding his "chronic use of alcohol."  The trial court in its order noted that the only germane evidence at the evidentiary hearing came from the testimony of Henyard's expert witness, Dr. Bauers.  Moreover, the trial court concluded that the first prong of <u>Strickland</u> had not been met because Henyard had not shown that the failure to present the alleged evidence of his history of chronic alcohol and marijuana use was based on trial counsel's deficient performance.

> We agree with the trial court's assessment of this claim. During the evidentiary hearing, Dr. Bauers testified that Henyard told him he started drinking beer and smoking marijuana between the ages of eight and ten, but he denied ever being seriously intoxicated or using hard drugs.  He also told Dr. Bauers that his use of alcohol and marijuana decreased when he went to  live with his father at the age of eleven.  There was no other evidence presented during the evidentiary hearing regarding Henyard's chronic use of alcohol.  Therefore, based on the fact that this issue was not addressed in any detail at the evidentiary hearing, Henyard has not demonstrated error in the trial court's conclusion that he has not shown his counsel's performance was deficient.

<u>Henyard</u>, 883 So.2d at 762-763

The Petitioner has not demonstrated that this resolution by the Florida Court was "contrary to," or involved an "unreasonable application of" governing precedent of the Supreme Court of the United States.

6.    <u>Not presenting evidence that the Petitioner had suicidal ideation</u>. Petitioner's lead trial counsel testified at the evidentiary hearing in the state trial court that after he spoke with Henyard about his alleged suicide attempt while in jail awaiting trial, counsel came away with the impression that Henyard faked the suicide attempt in order to be moved to the medical wing in the jail.  (Ex. C6 at 1156; Ex. C7 at 1183),   The Lake County Jail's medical department supervisor testified that Petitioner placed a nylon cord around his neck and inched down the bed until the cord tightened around his neck, a method not likely to prove fatal.  (Ex. C7 at 1234-36). When the supervisor examined Petitioner after his "suicide attempt," the Petitioner pretended to be unconscious, and the supervisor informed Petitioner's attorneys of his opinion that this had not been a legitimate suicide attempt.  (Ex. C7 at 1238).  In analyzing this claim, the state trial court stated:

> Had the jury and the Court heard about this incident [at the penalty phase] in all likelihood it would have established only that Henyard is a prevaricating manipulator of the system.  Even if the jury somehow concluded that this suicidal gesture was sincere, which the Court sincerely doubts, when viewed in light of Henyard's villainous deeds, it is trivial and would not have changed the jury's recommendations or the Court's sentences.

On appeal, the Supreme Court of Florida also rejected this aspect of the Petitioner's claim saying:

31

> Henyard contends that trial counsel was ineffective for not presenting evidence to the jury during the penalty phase of the trial of his mental state as characterized by his suicidal ideations. Although Jacqueline Turner, Henyard's godmother, testified that Henyard told her he did not want to live after he had been arrested, the primary evidence related to suicidal tendencies that came out at the evidentiary hearing, centered on an alleged suicide attempt in the Lake County Jail after Henyard had been arrested for the murders. Trial counsel was made aware of Henyard's suicide attempt by the medical department supervisor from the Lake County Jail, Dan Pincus. Pincus also advised trial counsel that Henyard was placed on suicide watch because it was possible that Henyard would try to commit suicide again. However, Pincus also informed Henyard's trial counsel that he did not believe the suicide attempt to be legitimate because Henyard was purposely keeping his eyes shut as Pincus was trying to examine him. Additionally, although Henyard was placed on suicide watch, the standard procedure when there was any threat of suicide, whether legitimate or not, was to place the prisoner on suicide watch. When trial counsel, T. Michael Johnson, asked Henyard about the suicide attempt, Henyard indicated that he wanted to go back in the medical wing of the jail.

Henyard, 883 So.2d at 763.

The Petitioner is unable to demonstrate that the state courts' denial of this subclaim was contrary to, or constituted an unreasonable application of, the Supreme Court decision in Strickland or any of its progeny.

7.    Counsel was deficient in preparing Dr. Jethro Toomer, a psychologist.

Petitioner alleges that his counsel was ineffective for failing to adequately prepare one of his mental health experts, Dr. Jethro Toomer, for his testimony at the penalty

phase.[8]   Specifically, Petitioner questions defense counsel's preparation of Dr. Toomer because the doctor did not speak with Richard Henyard, Sr., Edith Ewing, or Jacqueline Turner's husband.  Dr. Toomer testified at the penalty phase that defense counsel supplied him with Henyard's school records and the names of family members and individuals to talk to prior to examining Henyard.  (Ex. A20 at 2303). Dr. Toomer interviewed Henyard's mother and Jacqueline Turner, but did not speak to Henyard's father because his involvement n Henyard's life was "somewhat limited compared to the other individuals" he spoke with.  (Ex. A20 at 2305, 2386).   In addition to speaking with family members and other individuals and reviewing school records, Dr. Toomer also examined Henyard on two occasions for a couple of hours at each session.  (Ex. A20 at 2303-05).

The Supreme Court of Florida rejected this subclaim as well.  The Court said:

> Henyard claims trial counsel was ineffective for failing to adequately prepare one of his mental health experts,  Dr. Jethro Toomer, for his testimony at the penalty phase. Henyard attempted to prove Dr. Toomer was not adequately prepared by comparing Dr. Toomer's results with the evidentiary hearing testimony of Dr. Bauers' results.
>
> We find Henyard's claim to be without merit.  The trial court found nothing in Dr. Bauers' testimony [at the post conviction evidentiary hearing] that was any more favorable to Henyard than the testimony Dr. Toomer provided at trial and also rejected this claim as legally insufficient because Henyard did not specify the mitigation that trial counsel failed to call to Dr. Toomer's attention.  Moreover, the trial

---

[8]      Defense counsel also had Dr. Elizabeth McMahon examine Henyard, but she advised counsel not to call her as a witness because she did not find any statutory or nonstatutory mitigators.  (Ex. C7 at 1164-65).

> court noted that the defense team consulted two mental
> health experts and that there was no evidence presented at
> the evidentiary hearing that Dr. Toomer was inadequately
> prepared.
>
> We agree with the trial court's decision on this claim.  At the
> evidentiary hearing, Dr. Bauers testified that he did not
> believe that Dr. Toomer did anything improper or that he in
> any way mishandled his examination or testimony.  In fact,
> Dr. Bauers characterized Henyard's neuropsychological
> abilities as exhibiting some strengths and some
> weaknesses, but indicated that the weaknesses were
> relatively mild and that they were consistent with what Dr.
> Bauers knew about Henyard's educational, occupational,
> and sociocultural background.  Therefore, we conclude the
> trial court did not err in finding that Henyard was not entitled
> to relief on this issue.

Henyard, 883 So.2d at 763-764

The Petitioner has not demonstrated that the Florida courts' disposition of this

issue was contrary to, or constituted an unreasonable application of, governing

precedent of the  Supreme Court of the United States.  Claim Eight is without merit

and is Denied.

## **COUNT NINE**

> THE PETITIONER WAS DENIED EFFECTIVE
> ASSISTANCE OF COUNSEL ON APPEAL
> WHEN COUNSEL FAILED TO RAISE THE
> TRIAL COURT'S DENIAL OF TRIAL
> COUNSEL'S MOTION TO WITHDRAW.

Before the Petitioner's trial, his appointed Public Defender moved to withdraw

because the State had listed a former client of the Public Defender's office as a

witness thus placing the Public Defender in the "untenable position of having to cross

examine a former client."  At the time, however, a governing Florida Statute, Section

34

27.53(3), Florida Statutes (1993) required more.  The statute provided that such a motion required a Public Defender to represent to the Court in a motion to withdraw that "the interests of those accused are so adverse or hostile that they cannot all be counseled by the Public Defender or his staff without conflict of interest. . ."  The Public Defender made no such representation in his motion in the Petitioner's case, and the Supreme Court of Florida held that the motion was properly denied for that reason.  The Court then concluded that appellate counsel could not be faulted for raising on appeal an argument that had no merit.  See Henyard, 883 So.2d at 764-765.

The Petitioner cannot and does not demonstrate that this disposition of the claim by the Florida Supreme Court was "contrary to" or involved an "unreasonable application of" governing Supreme Court authority.  Claim Nine is without merit and is Denied.

## CLAIM TEN

THE PETITIONER'S EIGHTH AMENDMENT RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT WILL BE VIOLATED BECAUSE HE MAY BE INCOMPETENT AT THE TIME.

This claim, on its face, is obviously premature.  No death warrant has yet been issued and the Petitioner is not confronted with execution.  As such, Claim Ten is without merit and is Denied.

The Clerk is directed to enter final judgment denying the petition with prejudice.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida, this 1st day of August, 2005.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
            Maurya McSheehy